[941 NYS2d 599]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v NICHO-
LAS SANCHEZ, Appellant.

First Department, April 10, 2012

242

## APPEARANCES OF COUNSEL

*Richard M. Greenberg, Office of the Appellate Defender*, New York City (*Margaret E. Knight* of counsel), for appellant.

*Robert T. Johnson, District Attorney*, Bronx (*Noah J. Chamoy* and *Rafael Curbelo* of counsel), for respondent.

## OPINION OF THE COURT

DeGrasse, J.

We find that defendant has not made a showing that he was denied effective assistance of counsel by reason of a conflict of interest that "operated on" or otherwise affected his defense at trial (*see People v Konstantinides*, 14 NY3d 1, 14 [2009]).

The complainant, a livery cab driver, was robbed at gunpoint by two assailants, one of whom he identified as defendant. On December 29, 2004 at about 7:00 P.M., the robbers hailed the complainant's cab at Broadway and West 225th Street. Upon entering the vehicle, defendant sat in the rear seat on the passenger's side and the other individual sat on the driver's side of the rear seat. When the complainant stopped the vehicle at West 233rd Street between Broadway and Bailey Avenue, defendant grabbed his collar and announced a robbery. The complainant turned toward defendant and saw that he was holding a handgun. At defendant's demand, the complainant turned over his money, rings and cell phone. Defendant's accomplice pulled the complainant out of the cab and the two robbers drove away leaving him in the street.

At 8:00 P.M. that evening, Detective Treacy of the 50th Precinct and Police Officer Tunnock of the Evidence Collection Team responded to 3460 Bailey Avenue where the complainant's livery cab had been recovered. The complainant, who met the officers at the scene, spoke with Detective Treacy and described his assailants as Hispanic males who were approximately 20 years old and five feet, eight inches tall. The complainant said one weighed about 150 pounds and the other 160 pounds. Officer Tunnock dusted the cab for fingerprints and retrieved eight

latent prints.[1] Officer Tunnock also downloaded nine time-recorded images from the cab's video surveillance system to a disc and then uploaded the images to his laptop computer. The images reflected the period between 7:11 and 7:20 P.M. According to his trial testimony, Detective Treacy recognized the person depicted in the passenger-side rear seat as defendant, who happened to be the complainant in a robbery he investigated in 2002. Detective O'Neil, who was assigned to the instant case, testified that he recognized defendant as a person he had known for about five years.

Treacy and O'Neil picked defendant up at 3340 Bailey Avenue, an address half a block from where the cab was recovered. The detectives brought defendant to a precinct, where he was photographed and then allowed to leave. The complainant identified defendant from a photo array on December 31, 2004 and picked him out of a lineup on January 19, 2005. Defendant was arrested after being identified in the lineup. In response to pedigree questions, he stated that he was 20 years old, five feet, six inches tall, weighed 160 pounds and lived at the 3340 Bailey Avenue address. On February 5, 2005, defendant was indicted for robbery in the first degree, grand larceny, criminal possession of stolen property and related offenses.

Defendant was represented at trial by the Legal Aid Society. During jury selection, the assistant district attorney (ADA) shared with defense counsel information that the fingerprint found on the cab's window matched Elvis Montero's fingerprint. The ADA also turned over to counsel three photographs of Montero as well as a complaint follow-up (DD5) report that contained Montero's name as well as that of Franklin DeJesus. After the jury was sworn but before opening statements, defense counsel informed the court that Legal Aid had represented DeJesus during part of the time that it was representing defendant. Counsel obtained this information from another Legal Aid attorney who had secured an acquittal for DeJesus in a robbery case. The following colloquy ensued on the subject of a purported conflict of interest:

> "[DEFENSE COUNSEL]: . . . Now, earlier, a couple of days earlier, we became aware of the fact that Offi-

---

**1.** On January 10, 2005, Detective Perruzza of the Latent Fingerprint Unit examined the prints and found four to be of value. None of the prints matched those of the complainant or defendant. However, a print that was lifted from the inside of the window of the rear door on the passenger side matched that of a man who turned out to be Elvis Montero.

cer O'Neil or Treacy had investigated an individual named Franklin DeJesus . . . And it came to light that my firm, the Legal Aid Society, represented Mr. DeJesus, unbeknownst to me, simultaneous to my representation of Mr. Sanchez. And [another attorney], of my office, represented him, went to trial with him last year.

"And it came to light through . . . privileged communication that there is some connection between this individual, Mr. Montero, and Mr. DeJesus. We're not sure exactly what that connection is, but we know it's there, but it came to us through privileged information, therefore, raising the possibility of a conflict.

"Now, we've talked to the Court about it. I've discussed it at length with my two supervisors, and I mean at length.

"What we've arrived at is this, that there is no conflict regarding the issue surrounding Mr. Montero and his print that was lifted from this cab in question. We don't see any conflict there. There would only be a conflict were we to go into the issue of Mr. DeJesus.

"For evidentiary reasons and for just reasons related to common sense, we don't see a need to go into Mr. DeJesus, since there is no physical evidence connecting him to this crime.

"Therefore, so long as we don't actively go into Mr. DeJesus, we don't see the possibility of a conflict, although anything is possible at a later date, we don't know who might come out, as of this moment, we no longer see it.

"Of course, if the People go into Mr. DeJesus, they may drag me into a conflict in the middle of this trial, but . . . they've expressed no interest in going into Mr. DeJesus.

"So that's the bottom line, Judge.

"We see the possibility of potential for conflict, but we also see that there's not necessarily one there.

"So, we're not asking the Court to act on this, we're

just reporting to the Court what our findings were. . . .

"Mr. DeJesus's information came to us last week. Mr. Montero's came to us yesterday. And the confidential information that came to me—actually came to me this morning for the first time. . . .

"With that in mind, we're ready to proceed. I have explained this to my client.

"THE COURT: [to the ADA] Is there anything the People wish to be heard on or any other matters before we proceed?

"[ADA]: . . . I just want the record to be clear that we have no information about this Mr. DeJesus. It's all based on speculation on defense counsel's part that, looking at a sealed folder and looking at a photo, comparing it to stills that were taken from the cab, that's his link that this is Mr. DeJesus. The name was provided to the detective by the defendant's brother. That was the only reason why the name appeared in one of the police reports."

The People's theory at trial was that defendant was the robber who sat in the rear seat on the passenger's side and held the gun. Defendant put forth alibi and third-party culpability defenses. With respect to the latter, defense counsel sought to place Montero, instead of defendant, in the passenger's side seat, saying the following in his opening statement:

"But you're going to get to look at the photos from this taxicab; you're going to get to look at the photos of [defendant] proximately contemporaneous with his arrest in this investigation.

"And then you're going to hear some more evidence. You're going to hear evidence from someone from the police Forensic Unit . . . And he's going to tell you that eight fingerprints were lifted from this taxicab. And he's going to tell you that those eight fingerprints, which were taken from two doors and, I believe, inside and out, were compared to [defendant's] fingerprints. And he's going to tell you that none of those fingerprints that were lifted from that cab the night this happened were a match with defendant.

"You will also hear that those prints were matched up with somebody else. You'll hear that person's name. That person was in the cab and his fingerprints were lifted. And you're going to get to look at that person's photo and compare it to the photos in that taxicab, the person whose fingerprints were lifted from the cab and matched."

The complainant testified defendant wielded the gun and sat in the rear seat on the passenger's side. By stipulation, a photograph of Montero was introduced into evidence during the People's case. Upon viewing the photo, the complainant testified that Montero was not involved in the robbery. After the People rested, defendant called five alibi witnesses and offered evidence in support of his third-party culpability defense. Defendant was convicted as set forth above and remanded for sentencing.

Defendant moved, through new counsel, for an order setting aside the verdict pursuant to CPL 330.30 (3) on the ground of newly discovered evidence.[2] In his supporting affidavit, defendant described a chance encounter at Riker's Island with DeJesus who, according to defendant, took responsibility for committing the subject robbery. Defendant, DeJesus, and his two Legal Aid attorneys testified as defense witnesses at an evidentiary hearing on the motion. Defendant reiterated his claim, testifying that DeJesus admitted to committing the robbery with Montero. DeJesus testified that he did not know Montero, did not commit a robbery with him and denied having told defendant that he had done so. The court denied defendant's CPL 330.30 (3) motion, finding "no evidence to be provided by Franklin DeJesus which is, in any respect, exculpatory, and surely nothing of such nature as to create a probability of a more favorable verdict to the defendant." In reaching its conclusion, the court found that defendant's testimony that DeJesus admitted committing the robbery would not have been admissible at trial.

As a preliminary matter, we note that the court correctly rejected defendant's argument that his testimony about DeJesus's alleged out-of-court admission would have been admissible as a declaration against DeJesus's penal interest. The unavailability of the declarant is a prerequisite to the admission of a declaration against penal interest (*People v*

---

2. While still represented by Legal Aid, defendant also moved pursuant to CPL 330.30 (1) for an order setting aside the verdict on the basis of the trial court's admission of police testimony discussed later in this opinion.

*Settles*, 46 NY2d 154, 167 [1978]). Defendant asserts that DeJesus would be unavailable if he decided to invoke his Fifth Amendment privilege. On this record, defendant failed to establish that DeJesus intended to invoke his Fifth Amendment privilege particularly in light of the fact that he testified at the CPL 330.30 (3) hearing.

■ Defendant claims to have been deprived of the effective assistance of counsel based on a conflict of interest arising from Legal Aid's representation of defendant as well as DeJesus, a person believed by counsel to have participated in the robbery. "The right to effective counsel ensures not only meaningful representation but also the assistance of counsel that is conflict-free and single[-]mindedly devoted to the client's best interests" (*People v Berroa*, 99 NY2d 134, 139 [2002] [internal quotation marks and citations omitted]). "That right is impaired when, absent a defendant's informed consent, defense counsel represents interests which are actually or potentially in conflict with those of the defendant" (*id.*). A defendant seeking to have a conviction overturned on account of counsel's relationship with a former client must first demonstrate a substantial possibility of a conflict between his or her interests and those of the former client (*see People v Ortiz*, 76 NY2d 652, 656-657 [1990]). To prevail on such a claim the defendant must "show that 'the conduct of his [or her] defense was in fact affected by the operation of the conflict of interest,' or that the conflict 'operated on' the representation" (*id.* at 657 [citation omitted]). Defendant posits that a conflict of interest was created by Legal Aid's dual representation of himself and DeJesus. We disagree.

As set forth above, Montero was the target of defendant's third-party culpability defense. The complainant's testimony was that defendant was the individual who sat on the passenger's side of the cab and held the gun. The theory of the defense was that Montero, and not defendant, was the robber depicted by the surveillance video image to be on the *passenger's* side of the rear seat. Although one of the defendant's Legal Aid attorneys testified at the CPL 330.30 (3) hearing that counsel thought DeJesus was depicted in the photograph on the *driver's* side, the third-party culpability defense, which was focused on Montero only, did not require counsel to implicate DeJesus or otherwise act in a way that was adverse to his interests. For this reason, counsel was correct in telling the court that there was no need to reference DeJesus by name during the trial. There was no conflict between defendant's interests and those of DeJesus.

Even if such a conflict existed, it would not have affected the conduct of the defense or operated on counsel's representation of defendant (*see People v Ortiz*, 76 NY2d at 657). We note that in putting forth the third-party culpability defense, counsel made unimpeded use of evidence consisting of: Detective Perruzza's expert testimony of a fingerprint match that linked Montero to the area of the cab where defendant sat; the video surveillance images; Montero's photograph which counsel urged the jury to compare to the video surveillance images during his summation; and stipulated police testimony that Montero was arrested for and confessed to a gunpoint robbery that he said he committed with two accomplices named Newton and Danny approximately seven weeks after the instant robbery. Based on the foregoing, we conclude that defendant was afforded "meaningful representation" sufficient to meet the constitutional requirement of effective representation of counsel (*see People v Baldi*, 54 NY2d 137, 147 [1981]).

We also find that defendant's claim that he was prejudiced by late disclosure of *Brady* material is unpreserved because defendant was afforded the very remedy he requested—the opportunity to present testimony of Montero's confession to the subsequent robbery (*see e.g. People v Monserate*, 256 AD2d 15, 16 [1998], *lv denied* 93 NY2d 855 [1999]). We decline to review the *Brady* claim in the interest of justice. Were we to review this claim, we would find that defendant received a meaningful opportunity to use the above alleged exculpatory material as evidence (*see People v Cortijo*, 70 NY2d 868, 870 [1987]).

Defendant made the CPL 330.30 (1) motion on the ground that the trial court erroneously permitted Detectives O'Neil and Treacy to testify that they recognized defendant as one of the robbers depicted in the video surveillance images. Defendant argued that the detectives' testimony constituted inadmissible lay opinion evidence. The trial court correctly rejected the argument. "A lay witness may give an opinion concerning the identity of a person depicted in a surveillance photograph if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury" (*People v Russell*, 165 AD2d 327, 333 [1991], *affd* 79 NY2d 1024 [1992]). In this case, the testimony of both detectives was properly admitted based on the evidence of their familiarity with defendant from prior occasions. Moreover, the identification testimony by the detectives was also relevant in light of Detective Treacy's testimony that defendant "got a lot

heavier" between December 2004 and the May 2006 trial (*see People v Russell*, 79 NY2d at 1025; *People v Steward*, 72 AD3d 524 [2010], *revd on other grounds* 17 NY3d 104 [2011]).

■ The court properly denied defendant's motion to suppress identification testimony. There is ample support for the court's finding that the persons depicted in the photo array and the lineup appeared to be in the same general age range and possessed largely similar facial and other characteristics. We find that the photo array met the requirement that the persons depicted therein resembled each other sufficiently so as to obviate a substantial likelihood that defendant would have been "singled out for identification" (*see People v Chipp*, 75 NY2d 327, 336 [1990], *cert denied* 498 US 833 [1990]). Similarly, the variations in skin tone and facial hair among defendant and the fillers in the lineup were minor (*see e.g. People v Lundquist*, 151 AD3d 505, 506 [1989], *lv denied* 74 NY2d 849 [1989]).

■ We are not persuaded by defendant's argument that a reversal is required because of the loss of exhibits consisting of some of the surveillance video images. Although the missing images have substantial importance to the issues of this case, the information that they could have provided is otherwise reflected by the surveillance images that were preserved. Therefore, the loss of the exhibits does not prevent effective appellate review (*see People v Yavru-Sakuk*, 98 NY2d 56, 59-60 [2002]). We also perceive no basis for reducing the sentence. We have considered defendant's remaining contentions and find them to be lacking in merit.

Accordingly, the judgment of the Supreme Court, Bronx County (Denis John Boyle, J.), rendered August 5, 2008, convicting defendant, after a jury trial, of robbery in the first degree, and sentencing him to a term of eight years, with five years' postrelease supervision, should be affirmed.

FREEDMAN, J. (dissenting). I respectfully disagree with the majority opinion and would reverse the conviction and remand the matter for a new trial based both on the conflict of interest and the improper admission of identification testimony by the police officers.

Defendant was convicted of robbing the driver of a livery cab at gunpoint on December 29, 2004. He voluntarily came to the police station on the next day, and was identified by the livery cab driver in a photo array on December 31st and in a lineup conducted on January 19, 2005. Immediately prior to opening

statements, defense counsel alerted the court that he had just learned that his firm (the Legal Aid Society) had another client, DeJesus, who may have had a connection to the case. Counsel reported that the prosecution had just informed him that the other Legal Aid client had been investigated by the police in connection with this robbery. Counsel also reported that he had learned, through a privileged communication, that this other client had "some connection" with another man, Elvis Montero, whose latent fingerprint had been recovered from the cab where the robbery occurred. The cab driver had failed, however, to identify Montero.

The existence of and information about the latent fingerprint was also disclosed to defense counsel just prior to trial. Defense counsel acknowledged that this raised the possibility of a conflict of interest, but stated that "[f]or evidentiary reasons and for just reasons related to common sense, we don't see a need to go into [the other client] since there is no physical evidence connecting him to this crime," concluding that this would avert the possible conflict. Defense counsel, who had been precluded from examining the other client's file, proceeded to try the case without reference to the other client.

The record does not disclose whether the conflict was explained to defendant, who suffered from and was on medication for mental illnesses. On appeal, defendant contends that he was denied effective assistance of counsel due to his trial counsel's conflict of interest, which adversely affected the conduct of his defense.

A defendant is entitled to "assistance of counsel that is conflict-free and single[-]mindedly devoted to the client's best interests. That right is impaired when, absent a defendant's informed consent, defense counsel represents interests which are actually or potentially in conflict with those of the defendant" (*People v Berroa*, 99 NY2d 134, 139 [2002] [internal quotation marks and citations omitted]). To prevail on a conflict claim based on successive representation, "a defendant does not have to establish that the conflict affected the outcome of the proceedings; a defendant must only show that the conflict operated on the defense" (*People v Konstantinides*, 14 NY3d 1, 14 [2009]; *see also People v Ortiz*, 76 NY2d 652 [1990]).

I believe that defendant's counsel was unable to avoid the potential conflict of interest simply by agreeing to not "go into" the other Legal Aid client at trial. Indeed, counsel's decision to overlook the evidence he had already obtained showing some

connection between the man investigated by the police and the man whose latent fingerprints were found in the livery cab, and to forgo any further pursuit of evidence of a connection between the two men, was itself the inevitable product of the conflict of interest he faced, which clearly affected the conduct of the defense. Rather than proceeding to trial with the understanding that there would be no reference to this other suspect, a non-conflicted attorney would have, at least, sought a recess of the trial to further investigate this suspect for the purpose of building a third-party culpability defense. Pursuant to a defense motion, a CPL article 330 hearing was conducted to determine whether evidence that subsequently came to light concerning the other client was a basis to reverse the conviction, but the trial court found that the allegedly new evidence, which in fact related to the other client, would not be helpful to defendant.

In addition, I believe that the admission of Detectives Treacy's and O'Neil's testimony identifying defendant based on the images from a digital camera taken from the cab was error. Although Detective Treacy's identification and arrest of defendant, whom he knew because the latter had been the victim of another crime, was based on the images, I reject the argument that the detectives' testimony merely completed the narrative as to how defendant became a suspect. The detectives not only testified as to their identification based on the camera images, some of which were lost, but Detective Treacy also testified that between defendant's arrest and trial he "got a lot heavier." The jury viewed the same digital videotapes that the detectives had. Even though the court instructed the jurors that it was for them to make the ultimate factual determination as to the identity of the person on the tapes, I find the admission of this testimony to be improper bolstering. While such testimony is "commonly allowed in cases where the defendant has changed his or her appearance since being photographed or taped, and the witness knew the defendant before that change of appearance" (*People v Coleman*, 78 AD3d 457, 458 [2010], *lv denied* 16 NY3d 829 [2011]), there is no such claim here. The prosecutor made no claim for admission based on weight gain when defendant objected to admission of the testimony. Rather, she argued that Detective Treacy's testimony and the prior identification evidence by the other officer were needed to explain police conduct in arresting defendant. As we noted in *People v Coleman*, admission of the detective's identification testimony was improper bolstering. Since the main issue in this

case is identification, I find admission of the testimony to be reversible error.

While defendant argues that the photo array followed by a lineup was unduly suggestive, in part based on differences in age and skin tone, that issue would not be a basis for reversal here. The use of a photo array followed by a lineup in which the defendant was the only individual present in both procedures was criticized in the recent decision of the New Jersey Supreme Court, *State v Henderson* (208 NJ 208, 255-256, 27 A3d 872, 900-901 [2011]), dealing with identification evidence; however, this court has never rejected the procedure.

Accordingly, I would find that the conflict of interest adversely affected the conduct of the defense (*see e.g. People v DiPippo*, 82 AD3d 786 [2011], *lv denied* 17 NY3d 903 [2011]), and the identification testimony of Detective Treacy was improperly admitted. For these reasons, I would reverse the conviction and remand for a new trial.

TOM, J.P., SAXE and ROMÁN, JJ., concur with DEGRASSE, J.; FREEDMAN, J., dissents in a separate opinion.

Judgment, Supreme Court, Bronx County, rendered August 5, 2008, affirmed.