**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3528-16T3

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JAMAL C. NURSE,

      Defendant-Appellant.

_____

      Submitted December 10, 2018 – Decided January 2, 2019

      Before Judges Sabatino, Haas and Sumners.

      On appeal from Superior Court of New Jersey, Law Division, Morris County, Indictment No. 15-07-0704.

      Joseph E. Krakora, Public Defender, attorney for appellant (Peter T. Blum, Assistant Deputy Public Defender, of counsel and on the brief).

      Gurbir S. Grewal, Attorney General, attorney for respondent (Claudia Joy Demitro, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

A Morris County grand jury charged defendant in a seven-count indictment with two counts of first-degree robbery, N.J.S.A. 2C:15-1(a)(2) (counts one and two); second-degree burglary, N.J.S.A. 2C:18-2(b)(2) (count three); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count five); and two counts of second-degree kidnapping, N.J.S.A. 2C:13-1(b)(1) (counts six and seven).

Prior to trial, the judge[1] denied defendant's motion to suppress identification evidence provided by his coworkers, who told the police that defendant was the individual seen in a surveillance video connected to the offenses.

Following a multi-day trial, the jury convicted defendant on counts one through five, and of the lesser-included offense of false imprisonment, a disorderly persons offense under N.J.S.A. 2C:13-3, on counts six and seven. The judge sentenced defendant to concurrent twelve-year terms on counts one and two, subject to the 85% parole ineligibility provisions of the No Early

---

[1] One judge handled the pre-trial motions and a different judge presided at the trial and sentencing. Because we have no reason to distinguish between the judges involved for purposes of this opinion, we do not.

Release Act (NERA), N.J.S.A. 2C:43-7.2; concurrent six-year terms on counts three, four,[2] and five, subject to NERA; and concurrent six-month terms on counts six and seven. Accordingly, defendant's aggregate sentence was twelve years, subject to NERA.

On appeal, defendant raises the following contentions:

POINT I

THE OUT-OF-COURT AND IN-COURT IDENTIFICATIONS WERE SUGGESTIVE, INADMISSIBLE, AND VIOLATED DUE PROCESS BECAUSE THE WITNESSES AND ADMINISTRATOR ALREADY SUSPECTED [DEFENDANT] OF THE ROBBERY WHEN THE WITNESSES IDENTIFIED HIM AS THE FACELESS MAN ON A GRAINY SURVEILLANCE VIDEO. U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, PARA. 1.

A. Arguments and Testimony at the Pre-Trial Suppression Hearing.

B. The Out-of-Court and In-Court Identifications Were Inadmissible.

---

[2] In rendering his oral sentencing decision, the judge stated that count four should merge into counts one, two, and three. However, the judgment of conviction (JOC) failed to reflect this merger. In Point V of his appellate brief, defendant argues that the JOC should have included this merger. The parties agree, and we concur, that merger of count four into the other counts was appropriate. Therefore, we remand to the trial court for the entry of a corrected JOC to address this mistake.

A-3528-16T3

C.    A New Trial Should Occur Because the Admission of the Identifications Was Harmful Error.

D.    Alternatively, a New Suppression Hearing Should Occur.

POINT II

A NEW TRIAL SHOULD OCCUR BECAUSE THE COURT IMPROPERLY REFUSED TO GIVE JURY INSTRUCTIONS APPROPRIATE TO WHEN AN IN-COURT IDENTIFICATION IS PRECEDED BY AN OUT-OF-COURT IDENTIFICATION, EVEN THOUGH THAT WAS THE SITUATION HERE. U.S. CONST., AMEND. XIV; N.J. CONST. ART. I, PARA. 1.

POINT III

AN INVESTIGATING DETECTIVE WHO DID NOT KNOW [DEFENDANT] WAS IMPROPERLY PERMITTED TO OPINE THAT [DEFENDANT'S] APPEARANCE WAS SIMILAR TO THE ROBBER'S. U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, PARA. 1.

POINT IV

THE COURT IMPROPERLY REFUSED TO GIVE A COOPERATING WITNESS INSTRUCTION REGARDING A WITNESS WHO TOLD OFFICERS THAT SHE DROVE [DEFENDANT] TO THE ROBBERY AND WHOM OFFICERS THREATENED WITH CRIMINAL CHARGES. U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, PARA. 1.

4                                                                    A-3528-16T3

POINT V

THE WRITTEN [JOC] SHOULD BE CORRECTED
TO MERGE GUN POSSESSION FOR AN
UNLAWFUL PURPOSE [UNDER COUNT FOUR OF
THE INDICTMENT] WITH THE SUBSTANTIVE
OFFENSES [SET FORTH IN COUNTS ONE, TWO,
AND THREE] THAT WERE THE PURPOSE OF THE
GUN POSSESSION.

After reviewing the record in light of the contentions advanced on appeal, we affirm defendant's convictions and aggregate sentence, but remand to the trial court to correct the JOC to reflect the merger of count four into counts one, two, and three.

I.

At approximately 11:00 p.m. on July 19, 2014, two employees of a children's store, M.D.[3] and M.W., left the business after it closed for the night. As they walked away, a man wearing a black stocking over his face rushed toward them, brandishing a handgun. The employees could not see the man's face, but his hands were uncovered. They described him as a very tall, thin man with a light complexion. He was wearing a black hoodie and ripped jeans.

The man ordered the employees to go back into the store and stated, "get me to the safe, hurry up, be quiet." Once they reached the safe in the manager's

---

[3] We use initials to identify the store employees in order to protect their privacy.

office, the man directed the employees to take the money out of the safe and put it in a black bag the man was carrying. The man also helped load the money into the bag. Some of the money was stacked and wrapped in blue, paper bands. Once the employees were done, the man ordered them to get under a desk while he fled the scene. The employees then called the police. The entire event was captured on the store's security cameras.

Detective Frank Franco was the lead detective on the investigation that followed. In addition to the store's security video, Detective Franco obtained surveillance video from several nearby businesses. The first of two important pieces of evidence came from the video taken from outside a car wash. On this video, the detective could see a white Honda parked in the car wash's parking lot before the robbery. There were two people in the car. The car remained in the lot for about thirty minutes, until it moved outside the children's store. Shortly before the robbery occurred, a man could be seen running toward the store. The car then left the scene.

The police later determined that the car belonged to Nicole Biggs. She testified at trial that she met defendant on "social media" in the weeks prior to July 19, and the two sometimes hung out together. On the night of the robbery, defendant called Biggs and asked her to help him pick up something from a

6

friend. Biggs agreed, and arrived at defendant's house around 9:00 p.m. Once he got into Biggs's car, defendant asked her to drive him to a hotel parking lot, where he called someone from a cellphone. He then told her to go to a department store. Biggs stated that defendant told her buy him some gloves at the store, but she refused to do so. However, she did go into the store to use the bathroom. When she got back into her car, she saw that defendant had changed his clothes and was now wearing a black, hooded sweatshirt and jeans. Defendant also had a piece of duct tape on his face.

After making another phone call, defendant told Biggs to take him to the car wash, where they parked for about thirty minutes. Defendant placed another phone call, and directed Biggs to drive around the children's store, and then to the parking lot of a plumbing company nearby. Defendant got out of the car and told Biggs to wait for him. Biggs testified that she did not see defendant after that. She called and texted him to say that she was going to leave if he did not come back. When defendant failed to reply, Biggs drove away. As discussed above, many of the movements of her car outside the children's store that she described at trial were captured by surveillance cameras.

Later that night, defendant called Biggs and told her it was "messed up" that she had left him, but he had gotten home anyway. Two days later, defendant

asked Biggs when he could get his "stuff back."[4]  After some back and forth between them, Biggs took defendant's things to his house and left them in a bag near his front door.

The two then began to argue with each other in a series of text messages. During this exchange, defendant boasted of how much money he had, and sent Biggs a photograph of himself holding six stacks of money on his lap that were wrapped together with blue, paper bands.[5]  Defendant was wearing red, Polo-brand boxer shorts in the photograph.

The next important item of evidence was a surveillance video Detective Franco obtained from the plumbing company.  In this video, the detective saw several views of a very tall, thin man moving around the area near the time of the robbery.  The man's face was not visible.  However, the detective could see that the man was wearing a Cincinnati Reds baseball cap, and his hair was styled in short braids that stuck out of the hat.  The man wore a light t-shirt and ripped blue jeans, and carried a black bag.  Detective Franco believed that the

---

[4]  Defendant had left a jacket and sneakers in Biggs's car after he changed his clothes in the department store parking lot.

[5]  Copies of the pertinent texts and the photograph were obtained from Biggs's phone and entered in evidence at the trial.

appearance of the man seen in the video was consistent with the descriptions M.D. and M.W. provided of the robber.

The day after the robbery, Detective Franco spoke to M.F., an investigator who worked for the children's store. Suspecting that the robbery was an "inside job," the detective asked M.F. if the store had any "problem employees." M.F. had spoken to M.D., M.W., and other employees at the store about this issue earlier in the day. M.F. identified defendant as an employee who had recently stopped showing up for work.[6] Defendant had worked part-time on the sales floor and in the "back of the house" for different shifts, including closing. Defendant was 6'6" tall, and weighed only 180 pounds. He had a light complexion, styled his hair in short braids, and frequently wore a baseball cap and jeans while working.

Several days after the robbery, Detective Franco called M.D. and M.W. and asked them to come to the police station because he wanted to show them a video. The detective testified that he did not tell the two employees that the video was taken from the plumbing company's surveillance system, or that he

---

[6] M.F. also identified a second individual, who had recently applied for a job at the store but did not get it. However, this individual was short and stocky and, therefore, was never considered a suspect.

A-3528-16T3

suspected that the person depicted in the video was the robber or defendant. Instead, he simply instructed them to look at the video and tell him what they saw.[7]

At trial, the prosecutor played the surveillance video and asked M.D. and M.W. if they could identify the person seen in it. Both employees testified that the man was defendant. They based their in-court identifications on their knowledge of defendant's appearance from when he worked with them at the store.

The police obtained a search warrant and searched defendant's home. They found a Cincinnati Reds baseball cap and a pair of red, Polo-brand boxer shorts. The police seized four cell phones, but were not able to recover any relevant data from them. No forensic evidence, such as fingerprints or DNA, was discovered.

---

[7] As discussed in greater detail in Section II of this opinion, M.D. and M.W. identified defendant as the man in the video as part of the out-of-court identification procedure Detective Franco conducted. However, the State presented no evidence concerning the employees' out-of-court identifications of defendant at trial, even though the motion judge had denied defendant's pre-trial motion to suppress this evidence.

II.

In Point I of his brief, defendant argues that the trial judge incorrectly denied his pre-trial motion to suppress the identifications M.D. and M.W. made of him after viewing the plumbing company surveillance video at the police station. Defendant contends that the judge erred by determining that the out-of-court identifications, and the in-court identifications the two employees made at trial, were admissible as lay opinion testimony under N.J.R.E. 701. Instead, defendant asserts that the judge should have excluded this evidence under State v. Henderson, 208 N.J. 208 (2011), because the procedures the police used to obtain the identifications were impermissibly suggestive and deprived him of his constitutional rights to due process and a fair trial under U.S. Const., amend. XIV, and N.J. Const. art. I, ¶ 1. We disagree.

The judge conducted a Rule 104 evidentiary hearing prior to ruling on defendant's suppression motion. Detective Franco was the only witness, and his account of how the identifications occurred was consistent with, but even more detailed than, his trial testimony.

As noted above, Detective Franco obtained a four-camera view, surveillance video from the plumbing company. The quality of the video was "grainy," but there were several fairly clear views of a man in the area near the

children's store. One of the cameras showed a front view of a man wearing ripped jeans, a light t-shirt, and a Cincinnati Reds hat. This angle showed the man crouching and walking. A second camera captured the man, his clothing, and his "distinctive twist" hairstyle. A third camera enabled the viewer "to observe this person's gait or style of walking[.]"

After obtaining this video, Detective Franco spoke to M.F., the children's store security investigator, who identified defendant as a possible disgruntled employee. The detective believed that the description he obtained of defendant was consistent with the physical appearance of the man in the surveillance video and the victims' description of the robber from the night of the crime. However, the detective could not be sure defendant was the man in the video because he did not know him.

Accordingly, Detective Franco reached out to M.D., M.W., and three other employees of the children's store. The detective chose these individuals because they had worked with defendant. He separately asked each employee to come to police headquarters to view a video.

At police headquarters, each employee was brought into the sergeant's office, which was a private area with a computer that was capable of showing the plumbing company video on a desktop monitor. Detective Franco was in

12

the room, along with two other officers. All of the employees were kept apart from each other.

None of the employees had ever seen the video before, and Detective Franco did not tell them anything in advance about the subject of the video, that it was a surveillance video from the plumbing company, or that it might depict a possible suspect in the robbery. He simply explained that he was going "to show them a video and once the video is played[,] I would like them to just tell me what they saw." He then played the plumbing company surveillance video for each employee.[8] Detective Franco's purpose in showing these individuals the video was "strictly to identify the individual in the . . . video." The employees were permitted to view the video as many times as they wanted and to enlarge it if desirable. This process was not recorded because the sergeant's office was not equipped to do so.

After an employee watched the video, he or she was taken to a different room, where they gave a video-recorded statement. M.D. and M.W. both told the officers that defendant was the man shown in the plumbing company

_____

[8] Detective Franco testified that he did not show the surveillance video of the actual robbery to M.D., M.W., or the other employees because the robber was wearing a mask and his hair was covered. In contrast, the plumbing company video showed several views of the man, in both stationary and walking positions, his clothes, height, and hair style.

surveillance video. In particular, M.D. stated that the "twist" hairstyle worn by the man, his mannerisms, and the length of his arms matched defendant. M.W. also recognized defendant as the man in the video, and remarked that his hair style and mannerisms were a match.[9]

At the conclusion of the hearing, the judge rendered a thorough oral decision denying defendant's motion to suppress the identifications made by M.D. and MW. In so ruling, the judge found that Detective Franco's testimony was "credible and reliable as to the source of what was done [during the identification process] and how it was done." The judge further found that the detective had done nothing to interfere with the employees' independent ability to view the contents of the video and provide their opinions on what they saw.

The judge concluded that the employees would be permitted to provide lay testimony at trial under N.J.R.E. 701 that defendant was the man shown in the plumbing company surveillance video. Under N.J.R.E. 701, "[i]f a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the

---

[9] Two of the other three employees identified defendant as the man in the plumbing store surveillance video. One of the employees could not make a positive identification of the man. Neither party called any of these three employees as a witness at the trial.

witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue."  Also, under N.J.R.E. 704, "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  Opinion testimony "is subject to exclusion if the risk of undue prejudice substantially outweighs its probative value."  State v. Summers, 176 N.J. 306, 312 (2003).

A witness who can demonstrate familiarity with the defendant may be permitted to testify regarding identification.  See State v. Lazo, 209 N.J. 9, 22-24 (2012) (citing State v. Carbone, 180 N.J. Super. 95 (Law. Div. 1981)).  For example, in Carbone, the court admitted the State's lay witness testimony of personal photographic identifications of the defendant before the jury by individuals who did not witness the crime, but nevertheless had personal knowledge of and familiarity with the defendant's appearance at the time the defendant committed the offense charged.  Id. at 96-100.  Underlying the court's decision were "crucial factors" such as the lack of available eyewitness identification and the change of the defendant's appearance since the time of the crime.  Id. at 100.

Citing Carbone, the judge found that the plumbing company surveillance video, although grainy in spots, contained "the type of imagery that [he] would

characterize as showing enough features and detail of a person to be able to give a pretty good general description of the person." Although the judge stated that neither he nor the detective would be able identify defendant from the video, M.D. and M.W. were in a "different position" because they worked with and knew defendant prior to viewing it. Thus, the judge determined that defendant's coworkers could rationally and competently form an opinion that they recognized the person in the video.

The judge also addressed the issue of suggestiveness, finding that there was no undue suggestibility in the identification procedure and that the detective's approach was sensible even though this was not a traditional identification process. In so finding, the judge recognized that this was not a double-blind procedure since Detective Franco already suspected defendant; however, the judge noted that the detective was careful not to taint the identification.

When reviewing an order denying a motion to bar identification evidence, our standard of review "is no different from our review of a trial court's findings in any non-jury case." State v. Wright, 444 N.J. Super. 347, 356 (App. Div. 2016) (citing State v. Johnson, 42 N.J. 146, 161 (1964)). We accept those findings of the trial court that are "supported by sufficient credible evidence in

16

the record." State v. Gamble, 218 N.J. 412, 424 (2014) (citing State v. Elders, 192 N.J. 224, 243 (2007)). Deference should be afforded to a trial judge's findings when they are "substantially influenced by his [or her] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." Johnson, 42 N.J. at 161. However, "[a] trial court's interpretation of the law . . . and the consequences that flow from established facts are not entitled to any special deference." Gamble, 218 N.J. at 425.

In addition, it is well settled that the admissibility of evidence is a matter within the sound discretion of the trial court. State v. McGuire, 419 N.J. Super. 88, 123 (App. Div. 2011). "Under that standard, an appellate court should not substitute its own judgment for that of the trial court, unless 'the trial court's ruling was so "wide of the mark that a manifest denial of justice resulted."'" State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

Applying these principles, we discern no basis for disturbing the trial judge's reasoned decision to permit M.D. and M.W. to provide lay opinion testimony; that is, their opinions that defendant was the individual depicted in the plumbing company surveillance video. In so ruling, we are mindful that there is no New Jersey appellate case law directly on point specifically

17

addressing the admissibility of a lay witness's opinion testimony that identified a defendant, based upon a review of a surveillance video. However, in Lazo, 209 N.J. at 19-24, our Supreme Court considered the admissibility of lay opinion testimony from a police officer regarding the reason he selected a photo of defendant to be included in a photo array, that is, because the officer believed defendant resembled a composite sketch of the suspect.

As noted in Lazo, resolution of the admissibility of this evidence question required consideration of a number of factors. For example, a trial court should consider whether the defendant had disguised his appearance during the offense or altered his appearance before trial; if not, then the jury could decide for itself if defendant was the person in the photograph. Id. at 22-23. Also, the court should consider whether there were additional witnesses to identify the defendant at trial, and how long the witness knew the defendant, and in what capacity. Id. at 23-24.

The Court held in Lazo that the officer was improperly permitted to give jurors his opinion that the defendant resembled a composite sketch of the suspect. Id. at 24. The Court cited favorably to the Law Division's 1981 decision in Carbone.

A-3528-16T3

In Carbone, the defendant was charged with five armed bank robberies, and the State had secured statements from individuals who knew the defendant, who identified him from photographs taken by the banks' surveillance cameras. 180 N.J. Super. at 96-97. Citing cases from other jurisdictions, the Law Division, as previously discussed, considered a number of factors in reaching its determination that the proposed identifications were admissible, including: the fact that the defendant's appearance had changed since the time of the offense charged; the lack of eyewitnesses to the offenses charged; the extent of the potential witnesses' familiarity with the defendant, particularly at the time of the offenses charged; and the basis of the witnesses' knowledge of the defendant. Id. at 97-100.

Although New Jersey law is sparse on the subject of the admissibility of lay opinion testimony identifying a defendant from surveillance video or surveillance photographs, there is abundant case law from other jurisdictions on the subject. Those cases generally hold that such testimony may be admissible after considering a variety of factors, including a number of the factors set forth under New Jersey case law in Lazo and Carbone.[10]

_____

[10] See, e.g., United States v. White, 639 F.3d 331, 335-36 (7th Cir. 2011); United States v. Contreras, 536 F.3d 1167, 1170-73 (10th Cir. 2008); United States v.

A-3528-16T3

Contrary to defendant's argument, a few courts from other states have concluded that lay opinion testimony is more likely to be admissible when the surveillance video is of passable quality, but is grainy or shows only a partial view of the person of interest. See, e.g., Nooner, 907 S.W.2d at 685; Glenn, 806 S.E.2d at 569; Barnes, 212 P.3d at 1025; Thompson, 49 N.E.3d at 404. In such cases, the lay witnesses' opinions become more valuable to the jury, based upon

Beck, 418 F.3d 1008, 1013-15 (9th Cir. 2005); Nooner v. State, 907 S.W.2d 677, 684-86 (Ark. 1995); People v. Leon, 352 P.3d 289, 312-13 (Cal. 2015); Robinson v. People, 927 P.2d 381, 382-85 (Colo. 1996) (en banc); Young v. United States, 111 A.3d 13, 15-16 (D.C. 2015); Glenn v. State, 806 S.E.2d 564, 568-69 (Ga. 2017); State v. Barnes, 212 P.3d 1017, 1020-26 (Idaho Ct. App. 2009); People v. Thompson, 49 N.E.3d 393, 402-09 (Ill. 2016); Gibson v. State, 709 N.E.2d 11, 15-16 (Ind. Ct. App. 1999); Morgan v. Commonwealth, 421 S.W.3d 388, 391-92 (Ky. 2014); State v. Berniard, 163 So.3d 71, 89-91 (La. Ct. App. 2015); State v. Robinson, 118 A.3d 242, 247-52 (Me. 2015); Moreland v. State, 53 A.3d 449, 453-56 (Md. Ct. Spec. App. 2012); Commonwealth v. Vacher, 14 N.E.3d 264, 278-79 (Mass. 2014); Lenoir v. State, 222 So.3d 273, 276-78 (Miss. 2017) (en banc); State v. Gardner, 955 S.W.2d 819, 823-25 (Mo. Ct. App. 1997); Rossana v. State, 934 P.2d 1045, 1048-49 (Nev. 1997); State v. Sweat, 404 P.3d 20, 22, 24-27 (N.M. Ct. App. 2017); People v. Sanchez, 941 N.Y.S.2d 599, 606 (App. Div. 2012), aff'd, 991 N.E.2d 698 (N.Y. 2013); State v. Patterson, 791 S.E.2d 517, 520-23 (N.C. Ct. App. 2016), review denied, 794 S.E.2d 328 (N.C. 2016); State v. Fripp, 721 S.E.2d 465, 467-69 (S.C. Ct. App. 2012); Woods v. State, 13 S.W.3d 100, 101-05 (Tex. Crim. App. 2000); State v. George, 206 P.3d 697, 700-02 (Wash. Ct. App. 2009), review denied, 217 P.3d 783 (Wash. 2009). But see State v. Finan, 881 A.2d 187, 191-94 (Conn. 2005); Ibar v. State, 938 So.2d 451, 462 (Fla. 2006).

their superior knowledge of the defendant's appearance, particularly around the time of the crime.

After considering the relevant Lazo and Carbone factors, we are satisfied that the judge correctly concluded that M.D. and M.W.'s identifications of defendant as the man in the plumbing company surveillance video were permissible lay opinions under N.J.R.E. 701. Both witnesses worked with defendant and, unlike the jurors, were fully familiar with his mannerisms, gait, and appearance, including his distinctive hairstyle.[11] Thus, they were able to draw on this knowledge when they watched the surveillance video.

Because of the grainy quality of the video, the jury likely would have been unable to identify whether defendant was the man in the video without the assistance of this testimony. Indeed, the judge noted that he would have been uncomfortable making such an identification because, unlike M.D. and M.W., he did not have a prior working relationship with defendant. Thus, M.D. and M.W.'s identification testimony was admissible because it was "rationally based on the perception of the witness[es]" and would assist the jury "in determining a fact in issue." N.J.R.E. 701. Under these circumstances, we detect no abuse

---

[11] By the time of the trial, defendant no longer wore his hair in short, twisted braids.

A-3528-16T3

of discretion in the judge's denial of defendant's suppression motion and the admission of the identification testimony.

We also reject defendant's claim that M.D. and M.W.'s identifications were made under suggestive conditions that required their exclusion under State v. Henderson. That case is clearly distinguishable from the matter at hand. As our colleague, Judge Allison Accurso, recently stated in Wright, "[t]he central point of Henderson is the recognition that suggestive procedures can skew a witness's report of his opportunity to view the crime[.]" 444 N.J. Super. at 360.

Here, Detective Franco did not ask M.D. or M.W. to identify the robber based on what they remembered from seeing him during the actual robbery. Instead, he showed them a surveillance video of a man walking and crouching in a parking lot and asked what they thought of it. Unlike crime victims who have only a fleeting opportunity to observe their assailant, M.D. and M.W. both knew defendant from working with him at the children's store. Thus, the witnesses were well-acquainted with defendant and, therefore, could rely on that relationship, rather than what they might have remembered from the robbery, in pinpointing defendant as the man in the video. See State v. Herrera, 187 N.J. 493, 507 (2006) (finding prior relationship a "significant, if not controlling" fact in determining reliability of identification procedure). Indeed, a "confirmatory"

identification, which occurs when a witness identifies someone he or she knows from before but cannot recall their name, is not considered suggestive. State v. Pressley, 232 N.J. 587, 592-93 (2018).

Under these circumstances, the "estimator variables" identified by the Henderson Court were inapplicable to the identification procedure involved in this case. These factors include stress; weapon focus; duration of the witness' observation of the perpetrator; distance and lighting; the witness' characteristics that could impact an identification's accuracy; the perpetrator's appearance, including whether a mask or disguise was employed; racial bias, and speed of an identification. Henderson, 208 N.J. at 261-272. Again, M.D. and M.W.'s testimony that defendant was the man in the plumbing company surveillance video was based entirely upon their past working relationship with him, and not upon their ability to see and remember what the robber looked like on the night of the crime.

Nevertheless, the judge did consider most of the "system variables" described in Henderson, and found that the procedure Detective Franco used to show the video to the employees was not unduly suggestive. These variables concern the manner in which the police conduct an identification procedure and include considerations such as the type of procedure used, what pre-

identification instructions were given to a witness, and whether suggestive feedback was given to a witness post-identification.  <u>Id.</u> at 248-61.

The judge noted that Detective Franco suspected defendant was the man in the surveillance video and, therefore, the procedure was not "double blind." The judge also observed that the police did not record the witnesses as they watched the video, which was "not ideal[.]"  Nevertheless, the judge concluded that

> the detective's approach was sensible, although [unlike a case governed by the <u>Henderson</u> rules,] this was not a constructed identification array or sequential photo identification process.  [Detective Franco] did employ, as was suggested, many of the principles of how to handle people so that you don't taint their process of identification.

Therefore, the judge concluded, and we agree, that the procedures the detective used were not unduly suggestive.

In addition, the judge ruled that defendant could address the question of possible taint on cross-examination of any witnesses the State proffered in connection with the identifications.  Defense counsel took full advantage of this opportunity at trial after M.D. and M.W. made their in-court identifications based on the surveillance video.

A-3528-16T3

In sum, there is no basis to disturb the judge's denial of defendant's suppression motion. We therefore reject defendant's contentions on this point.

III.

At the end of the trial, the judge gave a detailed instruction to the jury on the in-court identifications M.D. and M.W. made of defendant based upon Model Jury Charge (Criminal), "Identification: In-Court Identification Only" (rev. July 19, 2012, eff. Sept. 4, 2012). In Point II, defendant argues that the judge erred by denying his request to give the jury the model charge for in-court identifications and out-of-court identifications.[12] We disagree.

It is well settled that "[a]ppropriate and proper charges are essential for a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (alteration in original) (internal quotation marks omitted) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). Jury instructions must give a "comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find." Id. at 159 (quoting State v. Green, 86 N.J. 281, 287-88 (1981)).

---

[12] Model Jury Charge (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. July 19, 2012, eff. Sept. 4, 2012).

"A trial court is vested with discretion in delivering the jury instructions that are most applicable to the criminal matter before it." State v. Funderburg, 225 N.J. 66, 80 (2016) (citing State v. Ernst, 32 N.J. 567, 583-84 (1960)). To assess the soundness of the jury instruction, we consider "how and in what sense, under the evidence before them, and the circumstances of the trial, would ordinary . . . jurors understand the instructions as a whole." State v. Savage, 172 N.J. 374, 387 (2002) (alteration in original) (internal quotation marks omitted) (quoting Crego v. Carp, 295 N.J. Super. 565, 573 (App. Div. 1996)).

Applying these principles, there are no grounds for disturbing the judge's determination that only the model judge charge for in-court identifications was appropriate. At trial, the State did not present evidence concerning the out-of-court identifications that were the subject of the pre-trial, Rule 104 hearing. Instead, M.D. and M.W. only made in-court identifications of defendant. Detective Franco was also careful not to reveal that either of the victims had identified defendant as the man in the plumbing company video prior to trial. Although M.W. made a fleeting remark on cross-examination that she thought it was defendant in the surveillance video when she was first shown it, defendant concedes in his brief that this comment was "oblique" and defense counsel asked no follow up questions.

As the judge noted, the State was "cautious and careful" not to refer to any out-of-court identifications during the trial.  As a result, there was no need to instruct the jury on identifications that were not introduced in evidence.  Moreover, the jury received ample guidance in the final jury charge on identification issues relating to the in-court identifications that were the only ones actually presented to the jury for consideration.  Therefore, we reject defendant's contention on this point.

IV.

In Point III, defendant argues for the first time on appeal that reversal is required because Detective Franco offered lay opinion witness testimony in violation of N.J.R.E. 701.  Defendant points to the detective's statement that the man's ripped jeans in the plumbing store surveillance video were "consistent with the blue jeans . . . [shown] on the [children's store] surveillance video[,]" and his answer in the affirmative when asked whether the man in the video "was consistent with the description [he] had received of the suspect and what [he] had seen on the [children's store] video."  Defendant also contends for the first time that it was improper for Detective Franco to testify that he suspected the man in the shopping store video might be defendant because both men were

27

extremely tall, styled their hair in short twists, and wore ripped jeans. In support of this position, defendant relies upon State v. Lazo.

Because defendant did not raise this issue at trial, we must review the matter for plain error. R. 2:10-2. Plain error is "error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the merits of his [or her] defense." State v. Timmendequas, 161 N.J. 515, 576-77 (1999) (quoting State v. Irving, 114 N.J. 427, 444 (1989)). "[A]ny finding of plain errors depends on an evaluation of the overall strength of the State's case." State v. Chapland, 187 N.J. 275, 289 (2006).

As noted above, N.J.R.E. 701 permits lay opinion testimony that is "rationally based on the perception of the witness" and "will assist in understanding the witness' testimony or in determining a fact in issue." Lay opinion testimony "is not a vehicle for offering the view of the witness about a series of facts that the jury can evaluate for itself or an opportunity to express a view on guilt or innocence." State v. McLean, 205 N.J. 438, 462 (2011) (remanding for a new trial on the defendant's possession with intent to distribute controlled dangerous substances charge because a police officer, who observed

the defendant hand an item to an individual in exchange for money, testified as to his opinion that a drug transaction had occurred).

In Lazo, the issue was whether it was proper for a detective who had no personal knowledge of the crime to testify at trial that he included the defendant's photo in a photo array because the defendant's photo resembled the composite sketch of the assailant. Lazo, 209 N.J. at 12. Unlike in this case, the defendant in Lazo fully presented and argued the issue at trial and, therefore, it was not raised as plain error as it is here. "The victim's identification was the only evidence linking defendant to the crime. No physical evidence or other corroboration of the identification was presented." Id. at 15.

The Court held that the detective's testimony violated N.J.R.E. 701 because his opinion was not based on personal knowledge and the testimony was introduced to bolster the victim's identification. Id. at 24. The Court further ruled that "[n]either a police officer nor another witness may improperly bolster or vouch for an eyewitness' credibility and thus invade the jury's province. Ibid. Because the identification was the only evidence against the defendant, the Court could not "conclude that the error was harmless." Id. at 27.

Contrary to defendant's assertions, the point of the detective's testimony was not to bolster an identification made by another witness. Detective Franco

did not testify that defendant was the man who robbed the victims. Instead, his testimony had a notably different, and more relevant, significance than the detective's testimony in Lazo: it laid the foundation for why defendant became a suspect and why the detective decided to show the two robbery victims, M.D. and M.W., the plumbing store surveillance video to see if they could recognize the man appearing in it. Indeed, in testimony that defendant omits from his appellate brief, Detective Franco agreed "it [was] fair to say [that M.D. and M.W.] would be in a better position to know what [defendant] looked like and to make that I.D. if there was an I.D. to make[.]" Because this was not improper lay opinion testimony, we are satisfied that the trial judge did not err in admitting it.

However, even if the detective's brief remarks were to any degree problematic, any error in admitting them was not "clearly capable of producing an unjust result[.]" Rule 2:10-2. This is so because, unlike in Lazo, the State had independent evidence in the form of Biggs's testimony placing defendant at the scene of both the children's store and the plumbing company on the night of the robbery. In addition, the State produced the photograph defendant sent Biggs showing him holding a number of stacks of money bound together with distinctive blue tape as was used at the store, and his texts stating that he now

had enough to pay cash for a car. Thus, there was strong evidence of defendant's guilt, separate and apart from the detective's testimony, that was more than sufficient to support the jury's verdict. Therefore, defendant's contention on this point fails.

V.

In Point IV, defendant argues that the trial judge erred by denying his request to give Model Jury Charge (Criminal), "Testimony of a Cooperating Co-Defendant or Witness" (rev. Feb. 6, 2006) (Cooperating Witness Charge) based upon Biggs's testimony at the trial. We disagree.

It is long-established that "a defendant has a right, upon request, to a specific jury instruction 'that the evidence of an accomplice is to be carefully scrutinized and assessed in the context of his specific interest in the context of his specific interest in the proceeding.'" State v. Adams, 194 N.J. 186, 207 (2008) (quoting State v. Begyn, 34 N.J. 35, 54 (1961)). The purpose of the Cooperating Witness Charge is to "caution the jury 'regarding the credibility of witnesses who may have a special interest in the outcome of the cause, which might lead to influencing their testimony.'" Id. at 208 (quoting Begyn, 34 N.J. at 54). "This special interest comes about by reason of hope, or even bargain,

A-3528-16T3

for favor in later prosecution treatment of the witness' own criminal conduct in return for aid in convicting the defendant." Begyn, 34 N.J. at 54.[13]

Defendant asserts that because the police gave Biggs Miranda[14] warnings when they first met with her, and stated she "could have been charged in a conspiracy or as an accessory" in the robbery, she had a "special interest" in the outcome of the case requiring the judge to give the jury the Cooperating Witness Charge. However, when defendant counsel asked Biggs at trial whether she "felt like as long as [she] cooperated with the police and told them that it was [defendant], that [she] felt like [she] would not be charged with this crime or . . . in a conspiracy or as an accessary to a crime[,]" she replied, "No."

Indeed, neither the police nor the prosecutor ever charged Biggs with any offense, and never asserted she played any role whatsoever in defendant's

---

[13] Thus, the Cooperating Charge provides:

> The law requires that the testimony of such a witness be given careful scrutiny. In weighing his/her testimony, therefore, you may consider whether he/she has a special interest in the outcome of the case and whether his/her testimony was influenced by the hope or expectation of any favorable treatment or reward, or by any feelings of revenge or reprisal.

[14] Miranda v. Arizona, 384 U.S. 436 (1966).

32

criminal conduct on the night of the robbery. Because Biggs faced no past, present, or future penal liability as the result of driving defendant around after he told her he was looking for his friend, she had no reason to seek any favor from the prosecution that would give her any "special interest" in the outcome of the trial or influence her testimony. Therefore, the judge did not err by denying defendant's request for a Cooperating Witness Charge.[15]

## VI.

In sum, we affirm defendant's convictions and aggregate sentence, but remand to the trial court to correct the JOC to reflect the merger of count four into counts one, two, and three.[16]

Affirmed in part; and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[15] In addition, defense counsel thoroughly cross-examined Biggs to challenge her credibility, and the judge instructed the jury on credibility at the beginning and end of the trial. Thus, any possible error in the failure to give the jury this instruction would have been harmless. Adams, 194 N.J. at 209.

[16] As for the balance of any of defendant's arguments not expressly discussed above, they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).